UNITED STATES of America, Plaintiff,

v.

**225 CARTONS, MORE OR LESS, OF AN ARTICLE OF DRUG, each carton containing 12/100 capsule bottles, labeled in part:**

(carton)

" * * * Sandoz Pharmaceuticals East Hanover, NJ 07936 * * * " with an area cut out showing bottle labeling described below

(bottle)

" * * * Fiorinal with Codeine No. 1 * * * Sandoz Inc. East Hanover, NJ * * * "

(insert attached to bottle)

"Fiorinal with Codeine Capsules * * * "

**144 packages, more or less, of an article of drug, each package containing 12/100 capsule bottles and covered by an unlabeled, see-through, cellophane overwrap, labeled in part:**

(bottle)

" * * * Fiorinal with Codeine No. 2 * * * Sandoz Inc. East Hanover, NJ * * * "

(insert attached to bottle)

"Fiorinal with Codeine Capsules * * * "

**4,780 blister packs, more or less, of an article of drug, each blister pack containing 20 capsules and one insert, labeled in part:**

(blister pack)

" * * * Fiorinal with Codeine No. 2 Sample * * * Sandoz, Inc. East Hanover, N.J. 07936 * * * "

and

**undetermined quantities of the articles of drug, Fiorinal with Codeine No. 1 and Fiorinal with Codeine No. 2, packaged and labeled as described above, Defendants.**

Civ. A. No. 86–3877.

United States District Court,
D. New Jersey.

March 8, 1988.

Samuel A. Alito, Jr., U.S. Atty. by Je-
rome L. Merin, Asst. U.S. Atty., Deputy

Chief, Civ. Div., Newark, N.J., Jacqueline H. Eagle, Civ. Div., Dept. of Justice, Office of Consumer Litigation, Washington, D.C., and Eric M. Blumberg, Associate Chief Counsel for Enforcement, Food and Drug Adm'n, Rockville, Md., for plaintiff.

Shanley & Fisher by Robert A. Boutillier, Morristown, N.J., for Claimant Sandoz Pharmaceuticals Corp.; Kleinfeld, Kaplan & Becker by Peter O. Safir, Bonnie Beavers, Washington, D.C., and Sandoz Pharmaceuticals Corp. by Anne S. Davidson, East Hanover, N.J., of counsel.

## OPINION

DEBEVOISE, District Judge.

### I. *The Proceedings*

Plaintiff is the United States which instituted this action on behalf of the Food and Drug Administration (FDA). The defendants are two prescription drug products, FIORINAL WITH CODEINE NO. 1 and NO. 2 (FWC No. 1 and FWC No. 2). The claimant is Sandoz Pharmaceutical Corporation (Sandoz) which manufacturers and distributes the FWC products.

This is an in rem seizure action brought under 21 U.S.C. § 334. The complaint for forfeiture alleges that the seized FWC No. 1 and FWC No. 2 are "new drugs" within the meaning of 21 U.S.C. § 321(p) which may not, without violating 21 U.S.C. § 355(a), be introduced into interstate commerce because a new drug application (NDA) has not been approved by the FDA pursuant to 21 U.S.C. § 355(b). Further, the complaint alleges that the FWC products are misbranded within the meaning of 21 U.S.C. § 352(f)(1) because their labeling fails to bear adequate directions for use, and they are not exempt from this requirement because they are unapproved "new drugs".

After the drugs were seized by the United States Marshal pursuant to court order, Sandoz intervened and filed a claim. In its answer it admitted that the court has jurisdiction, that the seized articles are drugs located within the jurisdiction of the court and that the seized articles were manufactured from one or more components which were shipped in interstate commerce. Sandoz denied that the FWC products are "new drugs" within the meaning of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, et seq. (the FDC Act) and that they are misbranded. Further, Sandoz defended on the ground that the case must be dismissed because the FDA did not develop an administrative record pursuant to 5 U.S.C. § 554 before it filed its complaint for forfeiture.

The FDA moved for summary judgment. It contends that to obtain judgment on the "new drug" charge it need only establish (i) that no NDA for the FWC products has been approved by the FDA (which Sandoz will admit) and (ii) that the FWC products are "new drugs". The FDA further contends that to obtain judgment on the misbranding charge it need only prove the same two facts and that the FWC products are prescription drugs (which Sandoz will admit). Thus, according to the FDA, the only contested issue is whether the FWC product is a new drug. The FDA submitted in support of its summary judgment motion exhibits and declarations of experts which, it contends, establish that there is no genuine issue of material fact and that the FWC product is indeed a new drug.

In response to FDA's motion Sandoz submitted declarations to support its contention that FWC No. 1 and FWC No. 2 are not new drugs and it moved pursuant to Fed.R.Civ.P. 56(f) for a continuance to permit discovery to oppose the motion for summary judgment.

### II. *The Applicable Statute and Regulations*

The FDA Act establishes a system for the premarket clearance of drug products. 21 U.S.C. § 355. Under the Act as adopted in 1938, 52 Stat. 1040, no new drug could lawfully be introduced into commerce unless and until an NDA for that product had been filed with and approved by the FDA. See 21 U.S.C. § 355(a), 52 Stat. 1052. The 1938 Act defined a new drug as any product which, among other things, was not "generally recognized" by qualified experts as *safe* for its intended use. See § 201(p), 52 Stat. 1041.

Congress adopted amendments to the FDA Act in 1962. See Drug Amendments of 1962, Pub.L. No. 87–781, 76 Stat. 780. Under the 1962 amendments manufacturers were required to show that a new drug product was *effective* as well as safe for its intended use. 21 U.S.C. § 355(a) and (b). A "new drug" was defined as "[a]ny drug … the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof.…" 21 U.S.C. § 321(p).

Under the 1962 amendments a manufacturer seeking approval of an NDA was required to submit "substantial evidence" of the product's safety and effectiveness. The statute defined "substantial evidence" as "evidence consisting of adequate and well-controlled investigations, including clinical investigations … on the basis of which it could fairly and responsibly be concluded … that the drug will have the effect it purports … to have under the conditions of use prescribed … in [its] labeling.…" 21 U.S.C. § 355(d). Sandoz FWC products are exempt from the FDA's premarket clearance procedures only if they are "generally recognized" as safe and effective for their intended uses. 21 U.S.C. § 321(p).

The 1962 amendments required the FDA to evaluate the effectiveness of all drug products, not grandfathered, which had been placed on the market since 1938. To do this, the FDA enlisted the services of the National Academy of Sciences—National Research Council (NAS–NRC), which, after investigation, made recommendations to the FDA regarding the effectiveness of therapeutic classes of products. As the FDA reviewed the NAS–NRC recommendations, it published drug efficacy study implementation (DESI) notices in the Federal Register which rated products as to their effectiveness for specific labeled indications. Products that were found to be effective were still regarded as new drugs and manufacturers were required to supplement their NDAs to conform to conditions imposed by the DESI notices. In the period shortly after adoption of the 1962 amendments the FDA issued informal opinions with respect to some drug products that they found were not new drugs. However, in 1968 the FDA adopted a regulation revoking all such opinions. 21 C.F.R. § 310.100(d). Thereafter virtually all prescription drug products which had come on the market since 1938 would be regarded as a new drug requiring either a full or, in certain narrowly defined cases, an abbreviated new drug application (ANDA).

In 1976 the FDA published a Compliance Policy Guide (CPG) which established enforcement priorities for proceedings against DESI-related drugs that were being marketed without approved applications. The sixth category included unapproved combination drugs that are related to drugs which had been found effective in the DESI program.

■ As noted above before a product can be exempted from the statutory, new drug preclearance procedures, it must be "generally recognized" by qualified experts as safe and effective for its intended uses. 21 U.S.C. § 321(p). The "general recognition" requirement does not involve the actual safety or effectiveness of the product. Rather, it is the product's reputation in the scientific community that is relevant. Further, the experts' opinion as to general recognition must be based upon well-controlled, clinical studies which are published; the opinions of experts may not be based upon uncontrolled data or upon their own personal experiences. *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 619, 93 S.Ct. 2469, 2478, 37 L.Ed.2d 207 (1973). The general recognition of a product's safety and effectiveness must be documented by at least the same quality and quantum of evidence that would suffice to obtain FDA's approval of the product in the first instance. *Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. 645, 652, 93 S.Ct. 2488, 2493, 37 L.Ed.2d 235 (1973).

Certain FDA regulations are particularly pertinent to the present case. One is con-

tained in 21 C.F.R. § 314.126. It sets forth in considerable detail the essential components of an adequate and well-controlled investigation. A study must meet these criteria in order to constitute substantial evidence of a product's effectiveness. *Weinberger v. Hynson, Westcott & Dunning, Inc., supra,* 412 U.S. at 617–20, 93 S.Ct. at 2477–78; *Cooper Laboratories, Inc. v. FDA,* 501 F.2d 772 (D.C.Cir.1974).

Another particularly pertinent regulation is set forth in 21 C.F.R. § 300.50 and provides in part:

(a) Two or more drugs may be combined in a single dosage form when each component makes a contribution to the claimed effects and the dosage of each component (amount, frequency, duration) is such that the combination is safe and effective for a significant patient population requiring such concurrent therapy as defined in the labeling for the drug.

These, then, are the statutory and regulatory provisions which must be applied in determining the critical factual issue in the case, namely, whether FWC No. 1 and FWC No. 2 are generally recognized on the basis of well-controlled, published clinical studies to be safe and effective for their intended use.

### III. *The FWC Products*

Fiorinal is an analgesic marketed by Sandoz. Originally it contained the peripheral analgesic aspirin (200 mg), phenacetin (130 mg), the analgesic adjuvant caffeine (40 mg) and the barbituate butalbital (50 mg). In 1983 pursuant to an FDA directive pertaining to products containing phenacetin, the phenacetin was removed and the quantity of aspirin was increased to 325 mg.

The FWC product consists of the Fiorinal ingredients plus varying amounts of codeine. FWC No. 1 contains 7.5 mg codeine; FWC No. 2 contains 15 mg codeine; FWC No. 3 (which is not a subject of seizure in the present case) contains 30 mg codeine. When phenacetin was removed from Fiorinal it was also removed from the FWC products. FWC is a widely prescribed combination product useful for severe tension headaches, post-surgical pain, and other forms of pain.

In 1962 Sandoz received from the FDA an informal written opinion that the FWC products were not new drugs. In July 1963 Sandoz began marketing FWC. In 1968 the FDA revoked all its informal opinions. 21 C.F.R. § 310.100(d).

In response to a 1973 DESI notice Sandoz submitted data to support its NDA for Fiorinal, but did not submit any data for its FWC products. On November 15, 1977, in response to this submission, the FDA published a DESI follow-up notice which stated that Fiorinal "has been evaluated as effective for ... tension ... headache" and that "[s]uch drugs are regarded as new drugs (21 U.S.C. § 321(p)."

In 1977 and 1978 Sandoz filed ANDAs with the FDA for its FWC products, the difference between an abbreviated and full NDA being that the abbreviated application need not contain full reports of clinical studies to prove the product's safety and effectiveness. 21 C.F.R. § 314.55(a). On both occasions the FDA rejected the applications because it had not made a specific finding that such short-form applications were appropriate for the FWC products and because the approved products, plain Fiorinal and Trigesic with Codeine, upon which Sandoz sought to "piggy back" its ANDA applications for the FWC products, contained different ingredients from the FWC products. FWC contains codeine; Fiorinal does not. FWC contains butalbital; Trigesic with Codeine does not.

Sandoz did not appeal these decisions but in 1978 filed a Notice of Claimed Investigational Exemption for a New Drug (IND). The IND has been maintained since that date.

In March 1978 FDA officials informed Sandoz that the FWC products were new drugs, requiring a full NDA. Sandoz was also informed, among other things, of the studies that would be required for approval of an NDA and that FWC No. 1 containing 7.5 mg codeine would probably not show effectiveness.

A June 24, 1980 FDA DESI order stated that no evidence had been presented to show that two products containing butalbi-

tal, acetaminophen and other analgesics were effective. On November 15, 1984 FDA sent Sandoz a Regulatory Letter reminding it that the FWC products were regarded as new drugs, that the FWC products were identical, similar or related to the barbiturate-analgesic combination drug product found to lack substantial evidence of effectiveness in the June 24, 1980 DESI order, and that continued marketing of the FWC products without an approved NDA would violate 21 U.S.A. § 355.

By letters dated December 5, 1984 and January 11, 1985, Sandoz responded to the November 15, 1984 regulatory letter and asked that the agency not take immediate regulatory action against FWC and further requested that the FDA allow FWC products to remain on the market pending review and approval of a soon-to-be submitted NDA. On February 1, 1985 Sandoz submitted an NDA for the FWC products.

On February 20, 1985 Sandoz submitted a third request that the FDA accept an ANDA for the FWC products, stating among other things that "Fiorinal with Codeine is identical to ... Fiorinal with the exception of a single active ingredient, codeine phosphate, ... the ingredients of Fiorinal with Codeine are in the same therapeutic class as the ingredients in Fiorinal, [and] there are ample data to establish that the addition of codeine to ... Fiorinal can be expected to have the same effect as Fiorinal."

On April 16, 1985 the FDA advised Sandoz that a preliminary review of its NDA for the FWC products indicated that the application was not approvable.

On April 26, 1985 Sandoz wrote the FDA and advised that it was taking the position that the FWC products were not new drugs. It cited a long history of safe and effective use and referred to "an extensive series of clinical investigations which have given rise to a general recognition of the safety and effectiveness of the product and the contribution thereto of each of its active components."

The April 26 letter was accompanied by the declarations of Dr. Donald Dalessio and Dr. Neil Raskin. Dr. Dalessio based an opinion about the safety and effectiveness of FWC products upon his experience in prescribing the drug for a 15 year period and upon published and unpublished material which Sandoz provided him. He referred specifically to the published studies of MacDonald and Ehrenreich and of Madore and Chiricosta and to a Sandoz multicenter study which had been submitted to the FDA in support of Sandoz' NDA.

On May 16, 1985 Sandoz submitted to the FDA the declaration of Dr. Arnold P. Friedman attesting to the general recognition of the safety and effectiveness of FWC products. None of the three declarations which Sandoz submitted differentiated between the three FWC formulations.

On October 3, 1986 the complaint in this action was filed and on January 12, 1987 the United States Marshal seized the FWC products.

IV. *The Published Clinical Studies*

The critical issue in this case is whether Sandoz' FWC products are generally recognized among qualified experts as safe and effective. Safety does not appear to be a contested issue, and thus the present inquiry is confined to the FWC products' effectiveness and to the effectiveness of each of their constituent drugs. The opinions of the experts as to general recognition must be based upon well-controlled clinical studies which are published. The parties in this proceeding refer to six such studies in support of and in opposition to the motion for summary judgment.

A. *Madore, P. and Chiricosta, A., "Analgesic Effect of Fiorinal with Codeine," Anesthesia and Analgesia, Vol. 46, No. 4 July–Aug. 1967:* This study used FWC No. 3 which contained 30 mg of codeine. The FWC No. 3 formulation differed from that which is presently marketed in that it contained 130 mg phenacetin and 200 mg aspirin. Today's FWC No. 3 (like today's FWC No. 1 and No. 2) contains no phenacetin and 325 mg aspirin.

In the Madore and Chiricosta study 41 patients who had undergone various types of operations and complained of acute pain episodes were given, in double-blind, single

dose, random-sequence fashion, one of three treatments: (a) placebo, (b) one capsule FWC No. 3, or (c) two capsules FWC No. 3. Thereafter, at hourly intervals and for 6 hours each patient's pain relief was evaluated. The authors concluded that both quantities of active drugs were superior to placebo at hours 2 through 4, and that two capsules of FWC No. 3 were superior to one capsule of the same product only at the first hour.

B. *MacDonald, C. and Ehrenreich, K.A., "A Double–Blind Comparison of Two Analgesics with Placebo Control," Canadian Med. Assoc. J. 95:1072–75, Nov. 19, 1966:* This study compared two codeine combination analgesics prescribed in the 1960s. One was FWC No. 2 as then formulated which contained butalbital (50 mg), phenacetin (130 mg), caffeine (40 mg), aspirin (200 mg) and codeine (16 mg). The other product, APC with Codeine, contained all of those ingredients except butalbital. One purpose of the study was to assess the contribution of butalbital.

In this study pain relief was measured in 83 post-surgical patients who reported a total of 206 episodes of severe or moderate pain. Patients estimated their level of post-operative pain just prior to treatment and their pain relief approximately one hour after treatment. Three treatments were assigned randomly to 206 severe or moderate pain episodes.

FWC No. 2 (having butalbital) provided greater pain relief than APC with Codeine (having no butalbital) in moderate and severe pain episodes and both were more effective than placebo.

C. *Desjardins, P.J., Cooper, S.A., and Finizio, T., "Efficacy of Low Dose Combination Analgesics: Acetaminophen/Codeine, Aspirin/Butalbital/Caffeine/Codeine, and Placebo in Oral Surgery Pain," Anesth.Prog. 1986, May–June, 33(3):143–6:* This was a double-blind, randomized, single-dose study performed to compare the efficacy and safety of two combination analgesic products to placebo. The products were Tylenol with Codeine No. 3 containing acetaminophen (300 mg) and codeine (30 mg) and FWC No. 3 con-

taining aspirin (325 mg), butalbital (50 mg), caffeine (40 mg) and codeine (30 mg). The study showed that FWC No. 3 was significantly more effective than placebo for total pain relief, peak relief and global evaluation. FWC No. 3 was numerically superior to Tylenol with Codeine No. 3 for every measure of analgesic efficacy but the difference did not achieve statistical significance. The report stated, "[w]hether the slight improvement in analgesia is therapeutically exploitable or whether it can be attributable to a caffeine or butalbital effect cannot be answered in the present study design."

D. *Forbes, J.A., Jones, K.F., Smith, W.K., and Gongloff, C.M., "Analgesic Effect of an Aspirin-codeine-butalbital-caffeine Combination and an Acetaminophen-codeine Combination in Postoperative Oral Surgery Pain," Pharmacotherapy 1986, Sept.–Oct. 6(5):240–47:* This study was a randomized, double-blind, placebo-controlled comparison between current formulas FWC No. 2 and Tylenol with Codeine No. 3. The efficacy of FWC No. 2 was compared to Tylenol with Codeine No. 3 and placebo in outpatients who had moderate or severe pain after the surgical removal of impacted third molars.

The report stated, among other things:

... Although the rationale for many combinations, for example, aspirin and codeine, is readily apparent, other combinations have less surface validity. One such combination is that of aspirin 325 mg, caffeine 40 mg, codeine phosphate 15 mg with butalbital 50 mg, a barbiturate.... The butalbital constituent of this combination is presumed to decrease anxiety and act as a muscle relaxant.

MacDonald et al demonstrated the statistical superiority of an aspirin-phenacetin-caffeine-codeine-butalbital combination to the combination without butalbital in the treatment of postoperative pain. The study, however, did not attempt to measure the effect, if any, of the medications on anxiety or relaxation. Although the study was conducted double-blind and employed a concomitant placebo control group, it was unusual in that (1) patients

could participate more than once, (2) only one measure of effect, pain relief, was used, and (3) patients were evaluated only once, that is, at one time point, after the administration of the study medication.

The Forbes study leads to the conclusions that each medication was significantly superior to placebo for measures of analgesia and relaxation and that although the butalbital containing combination provided consistently greater analgesia, the differences between the active medications were not statistically significant. The report further stated that "[o]ne can only speculate as to the relative contribution of the constituents of these combinations since a factorial study was not conducted."

E. Friedman, A.P., et al., "Assessment of Fiorinal with Codeine in the Treatment of Tension Headache," Clinical Therapeutics, Vol. 8, No. 6, 703–21, 1986: This was a double-blind, randomized multicenter study in which 39 patients with specific symptoms of tension headache (pain, psychic tension, and muscle-stiffness) and 15 patients with any two of those symptoms were given one of four treatments: the early version of FWC No. 3 (containing phenacetin and 200 mg aspirin); the early version of plain Fiorinal (also containing phenacetin and 200 mg aspirin); codeine phosphate (30 mg); or placebo. Before taking one of these treatments and at .5, 1, 2, 3 and 4 hours following treatment patients rated six items on a four point scale. The physicians also made global evaluations of the effectiveness of treatment.

FWC No. 3 was found to be generally significantly more effective than placebo or Fiorinal alone in improving all patient-evaluated items between the second and fourth hours after administration. FWC No. 3 was also found to be generally significantly better than codeine alone with respect to pain severity, pain relief, the ability to perform daily activities and average pathology. The three variables rated by the physicians also were found to be generally reduced significantly more with FWC No. 3 than with placebo or Fiorinal alone.

F. Dar-shong Hwang, Ph.D., et al., "Fiorinal with Codeine in the Management of Tension Headache: Impact of Placebo Response," Clinical Therapeutics, Vol. 9, No. 2, 1987: This study analyzed a subset of 67 patients admitted under a protocol identical to the Friedman, et al., study. It compared the old Fiorinal (containing phenacetin and 200 mg aspirin), the old FWC No. 3 (containing phenacetin and 200 mg aspirin), codeine and placebo. The report noted that "[i]n the original analysis of the study data, no distinction was apparent between patient response to Fiorinal with Codeine and the response to the individual components, a finding that appeared to conflict with the results of a similar earlier study." The authors of the report attributed the discrepancy to a high placebo response in the later study. To adjust for this factor they identified a subset of less anxious patients with mild to moderate pain severity who, according to the authors, were least likely to respond to placebo.

Based on the data from this less anxious subset of patients the authors found that FWC No. 3 was significantly better than placebo in improving patients' self-ratings of various symptoms of tension headache at 0.5, 1, 2, 3, and 4 hours after ingestion of the study medication and that FWC No. 3 was also consistently superior to Fiorinal alone and codeine alone in improving patients' self-evaluation items, and differences between FWC No. 3 and its components were generally of statistical or borderline significance during the last half of the study.

The investigators' assessments of the effect of treatment on the three principal variables in tension headache (headache pain, psychic tension, and muscle contraction of the head, neck and shoulders) at the final patient visit also showed FWC No. 3 to be significantly superior to placebo and consistently superior to Fiorinal and codeine. The superiority of FWC No. 3 over Fiorinal alone achieved borderline significance for headache pain and psychic tension.

## V. *Summary Judgment Standards*

In order to prevail on a motion for summary judgment, a moving party must establish that "there is no genuine issue as to any material fact and that [it is] entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). The moving party has the initial burden of informing the court of the basis of its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A plaintiff opposing a summary judgment motion must set forth specific facts showing a genuine issue of material fact. "[T]he inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Id.* 106 S.Ct. at 1357. However, the *Matsushita* Court explained that in evaluating the evidence presented, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" 106 S.Ct. at 1356.

In addition, should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for summary judgment or may order a continuance to permit affidavits to be obtained or discovery taken. Fed.R.Civ.P. 56(f).

## VI. *The FDA's Demonstration*

The FDC Act provides that no new drug may be introduced into interstate commerce unless and until the FDA has approved an application for that drug. 21 U.S.C. §§ 355(a), 331(a). Before products such as FWC No. 1 and FWC No. 2 can be exempted from the statutory new drug preclearance procedures they must be "gener-

ally recognized" by qualified experts as safe and effective for their intended uses. 21 U.S.C. § 321(p). The "general recognition" requirement does not involve the actual safety or effectiveness of the product. Rather, it is the product's reputation in the scientific community that is relevant.

An expert's opinion as to general recognition must be based upon published well-controlled clinical studies meeting the requirements of 21 C.F.R. § 314.126 and may not be based on uncontrolled data and personal experience. Further, when a product contains more than one active ingredient, the contribution of each ingredient in the product must be scientifically demonstrated.

It is FDA's contention that there are no well-controlled clinical studies on the basis of which it can be concluded that FWC No. 1 and FWC No. 2 are effective for their labeled indications and there are none which show that each ingredient of the FWC products contributes to the effectiveness of these two products. This being so, FDA urges, it is entitled to summary judgment.

To establish the absence of a factual issue, the FDA has submitted the declaration of six highly qualified experts, William Forrest, M.D., Thomas Kantor, M.D. Michael Weintraub, M.D., Michael Lockshin, M.D., Richard Black, M.D. and Raymond Dionne, D.D.S., Ph.D. The FDA asked each of them to give his opinion regarding the general recognition of the safety and effectiveness of FWC No. 1 and FWC No. 2 and whether each component of the two drugs contributes to their effectiveness. Their factual statements and opinions were generally to the same effect. They can be summarized as follows:

The doctors described the contents of the two FWC products and referred to their labels which set forth the conditions for which the products may be used. They noted their familiarity with the requirements of 21 C.F.R. § 314.126 and 21 C.F.R. § 300.50.

As the manufacturer of a combination drug product Sandoz must show that each

ingredient in FWC No. 1 and FWC No. 2 contributes to the claimed effects. Typical of the opinion of the six doctors is that of Dr. Forrest:

8.a. ... To establish that FWC No. 1 complies with [§ 300.50 governing combination drug products], Sandoz must show that the addition of codeine (7.5 mg.) will significantly increase the effectiveness of the combination of aspirin (325 mg.), caffeine (40 mg.), and butalbital (50 mg.) to treat mild to moderate pain as indicated in this product's label. This must be done by conducting adequate and well-controlled studies in which the effect of the combination of aspirin, caffeine, and butalbital is compared *with* the effect of the combination of aspirin, caffeine, codeine, and butalbital (*i.e.,* FWC No. 1) in patients who have mild to moderate pain. The addition of 7.5 mg. codeine is justified only if there is significantly greater relief of pain in the latter group.

b. Because FWC No. 1 also contains butalbital and caffeine, Sandoz must further show that the addition of each of these ingredients, *as formulated in FWC No. 1,* significantly increases the effectiveness of the FWC No. 1 combination. These showings must be made by comparing the pain relief achieved with FWC No. 1 against the relief achieved with additional control groups which eliminate each of the ingredients whose effect is to be measured (*e.g.,* to measure the contribution of butalbital, a group of patients must receive aspirin, caffeine and codeine; to measure the contribution of caffeine a group of patients must receive aspirin, codeine, and butalbital). (In my view, it is necessary to separately establish the contribution of caffeine in this product, even though there is reasonable evidence which shows that caffeine in larger doses (65 mg.) enhances the effectiveness of clinical doses of aspirin. I am not aware of any adequate and well-controlled studies which show that caffeine increases the effectiveness of aspirin when codeine and butalbital are present in the product.) The studies outlined in paragraphs 8a and 8b could be combined.

c. Because the foregoing reasoning applies with equal force to FWC No. 2, each of the showings described in paragraphs 8a and 8b above would have to be made with the FWC product which contains 15 mg. codeine phosphate.

The FDA doctors reviewed the published data which Sandoz furnished to the FDA and concluded that none of it contributes information on the safety and efficacy of FWC No. 1 and FWC No. 2 as they are presently constituted.

With respect to FWC No. 1, the experts noted that none of the studies analyzed an FWC product which contained 7.5 mg codeine phosphate. One of the studies reviewed by the FDA experts used the FWC No. 2 product which contained 15 mg codeine. The other studies reviewed by the FDA experts used FWC No. 3, a product which contained 30 mg codeine. Thus the products which were studied contained two and four times the amount of codeine contained in FWC No. 1. There is, therefore, an absence of published clinical data to show that 7.5 mg codeine will contribute to the effects claimed for FWC No. 1.

Further, the FDA's experts found that the studies which Sandoz had submitted to the FDA contained deficiencies which rendered them not well-controlled and thus incapable of supporting the claims of either FWC No. 1 or FWC No. 2. The various clinical studies submitted in connection with this proceeding are described above. The FDA doctors addressed the three of them which Sandoz had submitted to the FDA during the course of its applications before that agency. They did not address three additional studies which Sandoz submitted in opposition to the summary judgment motion.

The FDA doctors referred first to the MacDonald and Ehrenreich study which compared the old FWC No. 2 formulation (containing phenacetin and only 200 mg aspirin) with APC with Codeine in an attempt, among other things, to establish the contribution of butalbital. The FDA doctors concluded that absent published data such as dissolution and/or bioavailability studies showing that removing phenacetin

and increasing the aspirin did not affect the product, one cannot rely upon it as evidence that the butalbital contained in FWC No. 2 (as presently formulated) contributes to the effectiveness of the product.

The MacDonald and Ehrenreich study provides no data which would enable one to evaluate the contribution of caffeine in the product, nor was it designed to do so.

The FDA doctors noted certain defects in the MacDonald and Ehrenreich study, some of which were noted in the Forbes, et al. study upon which Sandoz relies. The study is flawed because the authors treated each episode of pain as a separate event even though the patients could have received different drugs for each episode and many patients received multiple treatments, an approach that detracts from the reliability of the findings. Further, there was only one postoperation assessment and even that assessment was not made consistently at one hour.

The Madore and Chiricosta study merely compared one capsule of the old formulation of FWC No. 3 (containing phenacetin and 200 mg aspirin) with two capsules of old formulation FWC No. 3 with placebo. The FDA doctors concluded that this study is inapplicable to FWC No. 1 and FWC No. 2 because it studies a product containing phenacetin and 125 mg less aspirin and because it studied a product having four times as much codeine as FWC No. 1 and twice as much codeine as FWC No. 2. Furthermore there is nothing in the study which would enable a person to determine how much each component in the currently marketed FWC No. 1 and FWC No. 2 product contributes to the claimed effects.

The FDA doctors also critiqued the Friedman study which compared the effects of (i) the old formulation of FWC No. 3, (ii) the old formulation of plain Fiorinal, (iii) codeine (30 mg) and (iv) placebo. This study rated only the contribution of codeine, containing no data concerning the contribution of butalbital or caffeine. The FDA experts stated that they could not take the butalbital data from MacDonald and apply it to the Friedman study. Apart from its various deficiencies and the fact that MacDonald studied old FWC No. 2 with 15 mg codeine and Friedman studied old FWC No. 3 with 30 mg codeine, in the MacDonald study the authors measured postoperative pain which, unlike tension headache measured by Friedman, is usually not described as having a tension component.

The FDA doctors found a number of general deficiencies in Friedman insofar as it purports to be a basis for conclusions about FWC No. 1 and FWC No. 2. It examined FWC No. 3 which contains 30 mg codeine as compared to FWC No. 1's and FWC No. 2's codeine content of 7.5 mg and 15 mg, respectively. The study dealt with the old formulation of FWC No. 3 containing phenacetin and only 200 mg aspirin. The authors failed to provide data or analysis assuring that test and control groups were comparable with respect to pertinent variables such as age, sex, severity of disease or investigator effect. In any event, in view of the unusual separation of drug effects in so few patients, in the opinion of the FDA doctors there should be a replication in the same pain model.

■ One must conclude that the FDA has sustained its initial summary judgment burden. It has identified those portions of the record which it believes demonstrates the absence of a genuine issue of material fact. Its experts have identified what they consider to be the relevant published clinical studies. They have set forth what must be published in the way of clinical studies to establish the general recognition of FWC No. 1 and FWC No. 2 as safe and effective and what must be published to establish the contribution that each component of those products makes to their claimed effect. Finally they have made an initial showing that the requisite published clinical studies do not establish the requisite recognition of the product or contribution of its components.

The burden shifts to Sandoz to show a genuine issue of material fact.

## VII. *Sandoz's Showing*

Sandoz asserts that there is an issue of material fact with respect to the new drug

issue. To support its contention that there is evidence that published well-controlled clinical studies establish that the FWC products are generally recognized by qualified experts as safe and effective for their claimed uses and that each component contributes to their effectiveness, Sandoz has submitted three studies not referred to by the FDA experts and it has submitted the declarations of eight eminent medical doctors or scientists. The additional studies are those by Hwang, et al., Desjardins, et al. and Forbes, et al. The doctors and scientists are Donald J. Dalessio, M.D., Robert B. Daroff, M.D., Arnold P. Friedman, M.D., Victor Siegel, M.D., Geroge W. Paulson, M.D., Irvin Warth, M.D., Dar–Shong Hwang, Ph.D., and Jack Singer, M.D. In addition Harry Baird, M.D., submitted a declaration reciting the history of FDA approval of Fiorinal (which originally contained aspirin 200 mg, phenacetin 132 mg, caffeine 40 mg, and butalbital 50 mg) and of the FDA's actions with respect to Fiorinal after issuance of the 1983 order for the removal of phenacetin. Further, Sandoz submitted the declaration of Karl A. Enright, M.D., who (under the name of K.A. Ehrenreich) conducted the study with MacDonald. He described certain of the procedures which were followed and attempted to answer the criticisms of the FDA experts.

I have reviewed with care the Sandoz submissions. I conclude that Sandoz has produced evidence on the basis of which a rational trier of the facts could conclude that FWC No. 1 and FWC No. 2 are safe and effective for their intended uses and that each component contributes to the claimed benefits of the two products. However, I also conclude that even if the six studies relied upon by Sandoz are deemed to be well-controlled clinical studies, they do not establish general recognition by qualified experts that the particular drugs in this case and each of the components of those drugs are effective to produce the claimed results.

A. *The Evidence of Effectiveness and Contribution:* By means of the available studies, by means of many years experience using FWC products and by means of extrapolating data obtained from the studies and from other sources, Sandoz's experts were able to arrive at their opinion that FWC products are in fact safe and effective for their intended uses and that each component contributes in one way or another to that effectiveness. It is significant that although there are three FWC products, only two of which are involved in this case, Sandoz's experts give global opinions about FWC products generally. They do not, and undoubtedly cannot on the basis of available data, differentiate between the three products when discussing their overall effect or the effect of their individual components. Because of the paucity of data they have had to treat as irrelevant the amount of codeine in each dosage.

The opinions of Sandoz's experts, which like the opinions of FDA's experts, are in good measure duplicative of each other, can be summarized as follows:

A single study evaluating each ingredient of FWC would be needlessly complex and a waste of resources. There are ample data, according to Sandoz's experts, in the published literature on FWC and that may be extrapolated to FWC from other published materials, and there is sufficient clinical experience of these experts to establish that FWC is more effective than each of its components and that each component contributes to the therapeutic effect.

The combination constituting FWC is a rational one. Aspirin, a peripherally acting agent, has well-recognized analgesic properties for all types of pain. Codeine, a centrally acting narcotic, has long been combined with aspirin and other peripheral analgesics. Where used together the additive effect is often substantially greater than would be achieved by administration of a higher degree of either aspirin or codeine alone. Caffeine has been shown to enhance the analgesic properties of aspirin and other analgesics. Butalbital is a barbituate having both sedative and muscle relaxing properties which are helpful in relieving the muscle contraction component of tension headache and muscular spasms that may be associated with other types of pain. Thus there is a general theoretical

basis for concluding that FWC would be effective to relieve pain and that each constituent drug would contribute something to that effectiveness.

Sandoz's experts point to the six studies described above to show that these generalized conclusions find support in adequate and well-controlled clinical trials. They acknowledge, as they must, that none of these studies tested FWC No. 1 and that only two of them tested FWC No. 2. They also acknowledge, as they must, that one of the two studies involving FWC No. 2 and three of the five studes testing FWC No. 3 tested the old formulation containing phenacetin (130 mg) and only 200 mg aspirin. Further, they acknowledge, as they must, that they rely on the MacDonald study to show that butalbital makes a contribution to the product and that there is no study involving FWC showing that caffeine makes a contribution. Nevertheless, the Sandoz experts conclude that by extrapolation from these studies as well as from other published data the necessary conclusions as to effectiveness and contribution can be made.

Conceding that Madore and Chiricosta was not designed to establish the contribution of any specific ingredient, the Sandoz experts state that it demonstrates the effectiveness of FWC versus placebo. They conclude that the 1983 formulation change involving the removal of phenacetin and increasing the aspirin dosage did not alter the effectiveness of the product and thus render less persuasive the Madore and Chiricosta study. The basis for this conclusion is that the FDA freely permitted substitution of aspirin or acetaminophen for phenacetin on a mg/mg basis. For example, Fiorinal, which had been approved by the FDA, was reformulated in this matter and the FDA did not require any new clinical trials. Confirmation of this conclusion was found in the Desjardins, et al. and Forbes, et al. studies which compared the present formulation of FWC No. 3 (Desjardins) and FWC No. 2 (Forbes) with placebo (and also with Tylenol with Codeine No. 3 and codeine alone in the case of Desjardins and also with Tylenol with Codeine No. 3 in the case of Forbes).

A greater degree of extrapolation and reliance on general knowledge and clinical experience is required by these experts in order to establish the contribution of each component of FWC.

Reliance is had on the MacDonald study to show the contribution of butalbital. In the Sandoz experts' opinion although the MacDonald study involved postsurgical pain the conclusion may be extrapolated to pain associated with muscle contraction. For reasons noted above although the MacDonald study involved the old formulation of FWC No. 2, it may be extrapolated to FWC No. 2 with the new formulation and to FWC No. 1.

To establish the effectiveness of codeine the Sandoz experts rely on "numerous articles concerning the enhanced effectiveness of analgesics with codeine" (Dalessio declaration p. 11) and upon the Friedman study, thus extrapolating the results of a study of the effect of codeine in a product having the old FWC No. 3 formulation and 30 mg codeine to new formulation FWC No. 2 having 15 mg codeine and to new formulation FWC No. 1 having 7.5 mg codeine. The Sandoz experts found the Hwang, et al. study to be confirmatory of the Friedman study.

None of the studies sought to evaluate the contribution of caffeine to any form of FWC. However, Sandoz's experts concluded that the fact of its contribution can be inferred on several bases. They refer to "available data concerning both caffeine and aspirin" which "may be extrapolated to support their contribution to Fiorinal with Codeine" (Siegel declaration p. 8). They refer to the fact that Fiorinal, which contains the same amounts of aspirin, caffeine and butalbital as FWC, was approved by the FDA, and therefore it must have been established that caffeine made a contribution to the effect of Fiorinal. They suggest that the addition of codeine would not alter that effect.

Sandoz submitted an article which perhaps summarizes the "available data" concerning aspirin and caffeine to which its experts referred: Laska, E.M., et al., "Caf-

feine as an Analgesic Adjuvant", The Journal of the American Medical Association, Vol. 251, No. 13, Apr. 6, 1984. The article surveys 30 clinical studies conducted during the past 20 years in order to assess the value of caffeine as an analgesic adjuvant. It concluded that "[b]ased on these studies and a review of the literature, it seems reasonable to conclude that the addition of caffeine, 65 mg, to an analgesic tablet taken in a two-tablet dose results in a more effective analgesic." From this Sandoz's experts arrive at the opinion that the 40 mg caffeine in FWC would combine with the aspirin and result in a more effective product.

These are all rational conclusions. If FDA were contending that FWC No. 1 and FWC No. 2 were not in fact safe and effective and that each constituent drug does not contribute to the total effect of the product, then the evidence submitted by Sandoz would be more than sufficient to create a genuine issue of fact.

However, actual safety and effectiveness and actual contribution of the components to the total effect are not the issues, *e.g., Premo Pharmaceutical Laboratories, Inc. v. United States,* 629 F.2d 795 (2d Cir. 1980). The issue is whether there is a lack of substantial evidence to support a finding that FWC No. 1 and FWC No. 2 are generally recognized as effective and a finding that each component of the two products contributes to their effectiveness, *e.g., Weinberger v. Hynson, Westcott & Dunning, Inc., supra.* Substantial evidence consists "of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved...." 21 U.S.C. § 355(d).

B. *The Lack of Substantial Evidence:* It is the FDA's position that the studies upon which Sandoz relies were not well-controlled clinical studies which meet the specific regulatory criteria. The FDA's experts pointed out what they considered to be deficiencies in the various studies. For the purposes of this opinion, however, I shall assume that they did meet the statutory and regulatory criteria. Their deficiency for the purpose of this case is that they did not adequately address the two drugs at issue and they did not adequately address the ingredients of those two drugs as used in those two drugs. The deficiencies cannot be remedied by the extensive clinical experience of Sandoz's experts who have prescribed some forms of FWC for a number of years. Nor can the deficiencies be remedied by the extensive extrapolation of data to which these experts resorted.

■ There is a rational bases for the requirement of 21 C.F.R. § 300.50 that in the case of a combination drug there be a showing that each active ingredient makes a contribution to the claimed effect. Most drugs are associated with some degree of risk. Further, any one component of a drug may react with or affect the safety and effectiveness of the other components of the drug. Accordingly, before two or more drugs may be combined into a single product, the manufacturer must demonstrate, by adequate and well-controlled investigations that each additional component provides a specific benefit to the patient that warrants the increased risk.

Sandoz's own evidence establishes that the clinical studies upon which it relies to establish the contribution of the components of FWC No. 1 and FWC No. 2 were not studies of either of those two drugs. Sandoz urges on a number of grounds that it should nevertheless prevail on this summary judgment motion.

Citing *Weinberger v. Bentex Pharmaceuticals, Inc.,* 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973), Sandoz contends that an exception to the well-controlled clinical investigations requirement exists for certain long-used drugs such as FWC No. 1 and FWC No. 2. In *Bentex* the Supreme Court stated that "[i]t *may* ... be true" that *"in some cases"* general recognition "might" be made without the type of scientific data necessary to obtain approval by the FDA. 412 U.S. at 652, 93 S.Ct. at 2493. (Emphasis added). The Supreme Court did not refer to long-used drugs as being within such an exception, and subsequent case law does not disclose any specific category

of cases which would fall within this dictum. The long use situation has specifically been held not to fall within any exception to the well-controlled clinical investigations requirement, *e.g., Upjohn Co. v. Finch,* 422 F.2d 944 (6th Cir.1970) (decided before *Bentex* ); *United States v. Articles of Food and Drug . . . Coli–Trol 80 Medciated,* 372 F.Supp. 915 (N.D.Ga.1974) (decided after *Bentex* ). Thus the extensive successful use of some forms of FWC by some of Sandoz's experts is not pertinent. Such use, of course, does not even purport to attest to the contribution of each FWC ingredient.

Sandoz contends that clinical studies of FWC containing phenacetin and 200 mg aspirin can be deemed to be clinical studies of FWC No. 1 and FWC No. 2 containing no phenacetin and 325 mg aspirin. Sandoz contends that inasmuch as FDA issued a Federal Register notice which required that phenacetin be removed from the old product and replaced with aspirin (or another analgesic), it must be concluded that the new and the old products will be equally efficacious. Force is given to this contention, Sandoz argues, by the fact that the FDA did not require new clinical trials of the newly formulated products.

It should be noted that the Federal Register notice was published under the authority of 21 U.S.C. § 355 governing *new drugs.* While the notice did not require manufacturers to conduct new clinical trials, it did require manufacturers to submit dissolution data and bioavailability data to show that the reformulation did not affect the products. 47 Fed.Reg. at 36641, col. 2.

The significance of the data which the FDA called for is noted in Dr. Lockshin's declaration:

The "new" and the "old" FWC No. 2 are simply two different products. They contain different amounts and types of active ingredients, and there is no published literature of which I am aware that establishes that these differences do not influence the effectiveness of the FWC No. 2 product. Such a showing could only be made by a direct comparison of the "new" and "old" FWC No. 2.

Additionally, I am not aware of any published data which shows that the two products contain the identical inactive ingredients or were manufactured under precisely the same conditions. These factors are important because they may affect the bioequivalence of the two products (i.e., their comparative rate and extent of absorption of the active ingredients). The bioequivalence of the two FWC product [sic] can also properly be established only by direct comparison.

None of Sandoz's experts state that they have any knowledge of the inactive ingredients in the new or the old formulations and they do not mention bioequivalence. More to the point, Sandoz's experts do not refer to any well-controlled, published scientific data upon which experts can fairly conclude that each of the ingredients in the new and old formulations is bioequivalent.

 Thus I conclude that studies conducted using the old formulation are not well-controlled clinical investigations of products using the new formulation and extrapolation of the data derived from them is not justified for the purpose of a "new drug" determination.

Sandoz advances a legal basis for applying clinical studies of contributions of components of FWC No. 3 (containing 30 mg codeine) to the ingredients of FWC No. 2 (containing 15 mg codeine) and FWC No. 1 (containing 7.5 mg codeine). It advances the same legal basis for applying clinical studies of contributions of components of old formulations of FWC to ingredients of products containing the new formulations. It cites *United States v. An Article of Drug . . . Mykocert,* 345 F.Supp. 571 (N.D. Ill.1972) and *United States v. Entrol–C Medicated,* 513 F.2d 1127 (9th Cir.1975) for the proposition that the general recognition of a combination preparation could under certain circumstances be based upon the general recognition of its component parts, presumably as they manifested themselves in other contexts. I conclude that the proper rule and the rule that will be followed in this circuit is that the combination policy of 21 C.F.R. § 300.50 can only be met by studies of the particular drug product at

issue or a drug having the same active ingredients which is demonstrably its bioequivalent. Even if *Mykocert* and *Entrol–C Medicated* were applied in this case, the exception to the general rule which they announce is limited and would not extend to the extrapolations Sandoz relies upon in this case.

Having made these general observations, I will state briefly the reasons why I have concluded that Sandoz has failed to produce evidence on the basis of which it could be found that published, well-controlled clinical studies establish recognition of the contribution of the ingredients of FWC No. 1 and FWC No. 2.

Initially, there has been no study of FWC No. 1 either with respect to its overall efficacy or with respect to its components.

There has been no study of any old or new FWC formulation to determine the contribution of 40 mg caffeine. Sandoz's experts described generally the phenomenon whereby combining caffeine with aspirin increases the effectiveness of aspirin. However, they did not specify what amount of caffeine was required or refer to any data describing the effect of adding caffeine when butalbital and codeine were a part of the mixture. The 1984 Laska article described 30 studies (most of which were not published) none of which involved a product containing either butalbital or codeine. The Laska article concluded that the addition of *65* mg caffeine to an analgesic tablet taken in a two tablet dose results in a more effective analgesic. Thus there are no published, well-controlled clinical studies showing what contribution 40 mg caffeine makes or what contribution caffeine in any amount makes to FWC No. 1 and FWC No. 2.

The only published study purporting to show the contribution of butalbital is the 1966 MacDonald study using the old phenacetin-containing FWC No. 2. Apart from the various deficiencies in that study referred to by the FDA's experts and in the Forbes report submitted by Sandoz, the study was conducted on a product having a different formulation which has not been shown to be the bioequivalent of FWC No. 1 or FWC No. 2.

Even though Sandoz has submitted evidence on the basis of which one could conclude that in general codeine has pain-relieving qualities, it has not produced evidence of published, well-controlled clinical studies that codeine or the amount of codeine in FWC No. 1 (7.5 mg codeine) and FWC No. 2 (15 mg codeine) contribute to the effectiveness of the product.

The Friedman and the Hwang studies dealt with the old formulation of FWC No. 3 which contained twice as much codeine as FWC No. 2 and four times as much codeine as FWC No. 1. I am disregarding the deficiencies in those studies to which the FDA's experts referred.

The MacDonald study sought only to determine the contribution of butalbital. The Desjardins study dealt with FWC No. 3 and did not analyze the contribution of the components of the drugs studied. The Forbes study, which did deal with FWC No. 2, did not purport to assess the effectiveness of each component. None of the Sandoz experts stated that either of the lower amounts of codeine in FWC No. 1 or FWC No. 2 made a clinically and statistically significant contribution to the seized articles, nor, more important, were there any published studies showing such contribution.

I conclude therefore that Sandoz has failed to produce evidence that there exist the published, well-controlled clinical studies on the basis of which one could find that FWC No. 1 and FWC No. 2 are generally recognized by qualified experts as effective for their intended use and that each of their active ingredients contributes to their effectiveness. FWC No. 1 and FWC No. 2 are, therefore, new drugs.

The only basis for denying the FDA's motion for summary judgment would be a showing by Sandoz that discovery would be likely to produce evidence which would preclude summary judgment. Sandoz has moved for a continuance and for leave to take discovery. I have noted the subjects about which Sandoz seeks to take discovery. Responses to the requested dis-

covery could not fill the void in necessary published clinical investigations. The information sought appears to me to be irrelevant and consequently the motion for a continuance and for discovery will be denied.

### VIII. *The Misbranding Claim*

 Having found that FWC No. 1 and FWC No. 2 are new drugs, it follows that they are also misbranded within the meaning of 21 U.S.C. § 352(f)(1) and 21 C.F.R. § 201.100(c) because their labeling has not been approved by the FDA in the context of an NDA.

### IX. *Remand for Administrative Review*

Sandoz asserts as an affirmative defense that the FDA has not made an administrative determination of FWC's new drug status on the basis of an administrative record, and thus the matter should be remanded to the FDA for a formal administrative determination. This, Sandoz asserts, would assist the court in developing a factual record.

 I see no reason to remand the case. An administrative proceeding is not mandated as a prerequisite to the institution of a seizure action under 21 U.S.C. § 334(a). The record before me is complete. There is nothing to suggest that there is any relevant published material which has not been submitted by one or the other of the parties. Remand would be at odds with the purposes of seizure, *Ewing v. Mytinger & Casselberry, Inc.,* 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950); *United States v. Alcon Laboratories,* 636 F.2d 876 (1st Cir.), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3005, 69 L.Ed.2d 388 (1981).

Therefore, Sandoz's contention that the case should be remanded to the FDA is rejected.

### X. *Conclusion*

Sandoz's motion for a continuance and for discovery will be denied. Sandoz's contention that the matter should be remanded to the FDA for administrative proceedings is rejected.

The FDA's motion for summary judgment on the new drug and misbranding issues is granted.

In its briefs in support of its motion for summary judgment the FDA asked for injunctive relief. Formal application for an injunction has not been made and consequently I will not act upon the request. The FDA may make formal application for an injunction if it wishes to do so.

The FDA is requested to submit a form of order implementing this opinion.