826 F.2d 564
 UNITED STATES of America, Plaintiff-Appellee,
v.
ARTICLES OF DRUG ... Promise Toothpaste for Sensitive Teeth
... Active Ingredients: Potassium Nitrate, Sodium
Monofluorophosphate ... Sensodyne-F Toothpaste for Sensitive
Teeth ... Active Ingredients: Potassium Nitrate, Sodium
Monofluorophosphate ... and Block Drug Co., Inc., Leonard N.
Block and James A. Block, Defendants-Appellants.
 No. 86-1238.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 24, 1986.
Decided July 31, 1987.
Rehearing Denied Sept. 1, 1987.
 
 Thomas O. Henteleff, Kleinfeld Kaplan & Becker, Washington, D.C., for defendants-appellants.
 Ann H. Wion, Associate Chief Counsel for Enforcement Office of Gen. Counsel, Food & Drug Admin., Rockville, Md., Anton R. Valukas, Atty., U.S.Dept. of Justice, Washington, D.C. for plaintiff-appellee.
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division.
 Before WOOD, COFFEY and RIPPLE, Circuit Judges.
 RIPPLE, Circuit Judge.
 
 
 1
 This is an appeal from an order granting summary judgment in favor of the government in a forfeiture action[1] brought against certain quantities of toothpaste manufactured and distributed by the defendants, Block Drug Company, and Leonard and James Block (collectively referred to as Block). The government alleged that the toothpastes were "new drugs," and that, because no approved new drug application (NDA) regarding these articles was on file with the Food & Drug Administration (FDA), they were subject to forfeiture. The district court determined that no genuine issue of material fact existed as to whether the articles were "new drugs" under 21 U.S.C. Sec. 321(p). We affirm the order of the district court.
 
 
 2
 * Background
 
 A. Procedural History
 
 3
 On January 1, 1983, Block began to market Promise and Sensodyne-F (collectively referred to as Promise). Promise combines sodium monofluorophosphate (sodium MFP) and potassium nitrate. Block's purpose in combining these ingredients was to produce a single toothpaste that provided both protection against cavities (through sodium MFP) and relief from dentin hypersensitivity (through potassium nitrate). In this way, people with sensitive teeth could receive cavity protection and relief from hypersensivity in a single brushing. At the time Block began to market the toothpaste, it had not filed an NDA for the products. Despite warnings from the FDA, Block continued to market the products.
 
 
 4
 The government brought multiple forfeiture actions against Block to seize and condemn the toothpaste. The government later amended its complaint to seek an injunction preventing Block from making further shipments of the toothpaste. The toothpaste mentioned in the complaint was seized on September 2, 1983. On September 26, 1984, the government filed a motion for summary judgment, or in the alternative, for a preliminary injunction. The district court granted the motion for summary judgment in an order issued November 20, 1985 and amended December 5, 1985. United States v. Articles of Drug ... Promise Toothpaste, 624 F.Supp. 776 (N.D.Ill.1985). On December 16, 1985, the district court declared the articles to be unapproved "new drugs," condemned them to be destroyed, and enjoined Block from further distribution of the toothpaste. R. 77. Block moved for a stay of judgment pending appeal on January 6, 1986. R. 80. On April 25, 1986, the district court granted Block's motion for a stay, "subject to the condition that defendants place appropriate warning labels on the products." Appellee's App. at 85.
 
 B. Statutory and Regulatory Framework
 1. New Drugs
 
 5
 Under the Federal Food, Drug, and Cosmetic Act (the Act), a "new drug" may not be introduced into interstate commerce unless an approved NDA is on file with the FDA. 21 U.S.C. Sec. 355(a). A drug is a "new drug" unless its manufacturer demonstrates that it is "generally recognized among experts" to be "safe and effective" for its recommended uses. 21 U.S.C. Sec. 321(p)(1).[2] The safety and effectiveness of the drug must be established by "substantial evidence." Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 629, 93 S.Ct. 2469, 2483, 37 L.Ed.2d 207 (1973). "Substantial evidence" is defined as:
 
 
 6
 evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof.
 
 
 7
 21 U.S.C. Sec. 355(d).
 
 2. Over-the-Counter Drugs
 
 8
 The FDA regulations also establish criteria for determining whether a drug may be marketed over-the-counter (OTC) or must be restricted to use by prescription of a physician. An OTC drug must meet the "new drug" requirements set out in the preceding paragraphs. Additionally, it must meet the labeling requirements of the Act (i.e., it may not be misbranded)[3] and the FDA must find that the drug is safe for OTC use.
 
 
 9
 In 1972, the FDA established its OTC drug review. 21 C.F.R. Sec. 330.10 sets forth "Procedures for classifying OTC drugs as generally recognized as safe and effective and not misbranded." A drug so classified may be marketed without prior FDA approval. The OTC review establishes a system of expert panels for each of the various categories of OTC drugs. Under this procedure, a panel solicits information from interested parties and recommends a proposed monograph that states the conditions under which the panel would consider the drugs to be generally recognized as safe and effective and not misbranded. The FDA then reviews the panel's recommendation and publishes an advance notice of proposed rulemaking that allows for public comment. After any new information is considered, the FDA publishes a tentative order establishing the conditions under which a category of OTC drugs is generally recognized as safe and effective and not misbranded. After considering any further comments or objections, the FDA publishes a final monograph.
 
 3. Combination Drugs
 
 10
 A "new drug" may be created by combining two or more drugs, neither of which is a new drug. 21 C.F.R. Sec. 310.3(h)(2). Even if the component parts of the new drug may be generally recognized as safe and effective, the combination of those parts may not be safe. There is the possibility that the component drugs, when combined, may have a different effect from that of each component drug individually. See United States v. Articles of Food and Drug ... Coli-Trol 80, 518 F.2d 743, 746 (5th Cir.1975). As the court stated in Coli-Trol 80, "new combinations of well-known drugs constitute new drugs for purposes of the Act exactly because the effects of drugs in combinations are often not the sum of their parts." Id.
 
 C. This Litigation
 
 11
 1. FDA Panel on Dentifrices and Dental Care Products
 
 
 12
 An expert panel was convened by the FDA to consider OTC dentifrices and dental care drug products that were generally recognized as safe and effective for preventing cavities. This panel classified sodium MFP as generally recognized as safe and effective. 45 Fed.Reg. 20,683-84 (1980). The panel also recommended that certain laboratory testing profiles could be used, as opposed to further clinical investigations, to determine the safety and effectiveness of approved anticaries products. Id. at 20,677-78. However, the panel's recommendations were limited to "single active ingredient" anticaries products. Id. at 20,673-74. It recommended that products combining an anticaries agent such as sodium MFP with another active ingredient be considered new drugs and be required to submit NDAs. Id.[4]
 
 
 13
 In May 1982, the panel issued a proposed monograph for products for the relief of oral discomfort. 47 Fed.Reg. 22,712 (1982). The panel recommended that potassium nitrate should be considered safe in certain dosages but found that there was insufficient data regarding its effectiveness as a desensitizing agent. 47 Fed.Reg. 22,754-55. The panel also recommended that certain combinations of active ingredients for the relief of oral discomfort be allowed. None of these was a sodium MFP/potassium nitrate combination. Id. at 22,719-23. Finally, the panel recommended that sodium MFP be considered safe as a desensitizing agent, but as with potassium nitrate, the panel found that there was insufficient data to establish its effectiveness. Id. at 22,751-53.
 
 
 14
 The proposed monograph for oral discomfort, published in May 1982, was based on pre-1979 data. During the comment period, both Block and Richardson-Vicks, another drug manufacturer, submitted post-1978 data on the effectiveness of potassium nitrate as a desensitizing agent.[5] Block also submitted data regarding the sodium MFP/potassium nitrate combination. This information was described by the district court as follows:
 
 
 15
 On October 18, 1982, Block also filed data on the safety and effectiveness of its MFP/potassium nitrate combination. This data contained no clinical testing of the combination, but discussed the rationale for the combination, toxicology data, fluoride bioavailability to demonstrate anticaries effectiveness, and nitrate bioavailability to demonstrate desensitizing effectiveness. On April 25, 1983, after it had begun marketing the drug, Block submitted additional fluoride bioavailability tests and animal anticaries studies, 4- and 8-week human safety studies, and the results of several clinical studies on potassium nitrate previously submitted by Richardson-Vicks.
 
 
 16
 On September 7, 1983, Block submitted the results of a recently completed 12-week clinical investigation (hereafter "Silverman study"), which tested a 5% potassium nitrate toothpaste (Vick's "Denquel"), a Block sodium MFP/potassium nitrate toothpaste, and a placebo toothpaste, containing only the toothpaste vehicle used in the seized products (i.e., no active ingredients) (Def.Ex. 22). The study did not include any testing of a .76% sodium mfp toothpaste, and did not test for cavity prevention. Sixty-eight patients were enrolled in the study, all of whom had complained of hypersensitive teeth and showed physical symptoms associated with hypersensitivity. A dental history taken before admission indicated that approximately 80% of these patients used fluoride toothpastes regularly before starting the study. The results showed that both Promise and Denquel reduced tooth hypersensitivity to a statistically significant greater level than the placebo toothpaste. There was no statistically significant difference between Promise and Denquel. The Silverman study is not published and defendant has not identified any other clinical study testing the combination product. (Def. Response to Pltf's First Set of Interrogatories, Nos. 7 and 30).
 
 
 17
 Promise Toothpaste, 624 F.Supp. at 780-81.[6]
 
 2. Motion for Summary Judgment
 
 18
 In addition to the information submitted to the FDA by Block, the district court also had before it opinion evidence from experts in the fields of dentistry and periodontics. The government produced three experts[7] who claimed that they had become aware of toothpaste containing the sodium MFP/potassium nitrate combination only after being contacted by the FDA in connection with this litigation. Each of the government's experts declared that he did not recognize Block's products as safe and effective for their labeled indications, and that he did not believe that the toothpastes were generally recognized by qualified experts as safe and effective. The government's experts also claimed to be unaware of any published materials concerning the sodium MFP/potassium nitrate combination, and they believed it to be "scientifically unsound to extrapolate solely from data regarding" the individual components "to make a determination about the effects of the combination." Id. at 781. The government's experts also stated that the Silverman study was deficient because it failed to test the combination toothpaste against a toothpaste containing only sodium MFP because there was some evidence that sodium MFP itself may reduce tooth hypersensitivity.
 
 
 19
 Block produced three experts who stated that Block's sodium MFP/potassium nitrate combination is generally recognized as safe and effective for both anticaries and hypersensitivity treatment. Block's experts opined that, because there was "no chemical, physical, or physiological basis" for believing that sodium MFP would interact with potassium nitrate in such a way as to affect the safety or efficacy of either ingredient, it was proper to extrapolate from the data on the individual components to make a determination as to the safety and effectiveness of the combination. Id. The district court specifically noted that the government's experts conceded that there was no "theoretical basis for assuming that potassium nitrate is likely to interact with sodium MFP." Id.
 
 
 20
 The defense experts also challenged the government experts' criticisms of the Silverman study. First, the defense experts claimed that it is "questionable whether sodium MFP has a desensitizing effect." Id. at 781-82. Therefore, they claimed that there was no need to test the results from the combination against the results from a sodium MFP-only toothpaste. Furthermore, Block's experts noted that 80% of the participants in the study stated that they had used fluoride toothpastes regularly before entering the study. The reduction in the participants' dental sensitivity could therefore, they argue, be attributed to potassium nitrate.
 
 The district court determined that:
 
 21
 the government can prove lack of "general recognition" [as required by Sec. 321(p) ] by proving an absence of material fact as to any of the following three issues: (1) general recognition in fact among the nation's experts that the seized drugs are safe and effective for their intended use; (2) the existence of adequate and well-controlled studies which constitute the "substantial evidence" of safety and effectiveness Sec. 355(d) requires for approval of an NDA; and (3) generally available scientific literature substantiating an expert consensus of safety and effectiveness.
 
 
 22
 Id. at 779. The court found that the government had failed to establish the absence of a genuine issue of material fact as to lack of general recognition in fact. Id. at 783. However, the court found that the government had met its burden with respect to both the "substantial evidence" and the "publication" requirements. Id. at 784-86. Therefore, it granted summary judgment in favor of the government.
 
 II
 Analysis
 
 23
 The standard of review for an order granting a motion for summary judgment is well-established:
 
 
 24
 A motion for summary judgment should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). An appellate court should reverse a grant of summary judgment upon the showing of a dispute over a material fact, however the plaintiff must "allude to specific facts which raise a genuine issue for trial." Linhart v. Glatfelter, 771 F.2d 1004, 1008 (7th Cir.1985). In reviewing a grant of summary judgment, an appellate court must view the record and the inferences drawn therefrom in the light most favorable to the party opposing the motion. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).
 
 
 25
 Illinois v. Bowen, 808 F.2d 571, 573-74 (7th Cir.1986).
 
 
 26
 The district court, in deciding the motion for summary judgment, examined the submissions of the parties with respect to each of the three issues that it had isolated: 1) general recognition in fact; 2) adequate and well-controlled studies establishing substantial evidence of safety and effectiveness; and 3) generally available scientific literature substantiating an expert consensus of safety and effectiveness. Because we believe the district court was correct in granting summary judgment to the government on the second issue, we do not need to address the other two.
 
 A. The Regulatory Standard
 
 27
 The FDA has promulgated regulations for OTC drugs to implement the requirements of both section 355(a) (which prohibits the marketing of a new drug, as defined in section 321, without an approved application attesting that it is safe and effective) and section 352 (which establishes the circumstances under which a category of drugs is not misbranded). These regulations provide in pertinent part:
 
 
 28
 Effectiveness means a reasonable expectation that, in a significant proportion of the target population, the pharmocological effect of the drug, when used under adequate directions for use and warnings against unsafe use, will provide clinically significant relief of the type claimed. Proof of effectiveness shall consist of controlled clinical investigations as defined in [Sec. 314.126] of this chapter, unless this requirement is waived on the basis of a showing that it is not reasonably applicable to the drug or essential to the validity of the investigation and that an alternative method of investigation is adequate to substantiate effectiveness.
 
 
 29
 21 C.F.R. Sec. 330.10(a)(4)(ii).
 
 
 30
 An OTC drug may combine two or more safe and effective active ingredients and may be generally recognized as safe and effective when each active ingredient makes a contribution to the claimed effect(s); when combining of the active ingredients does not decrease the safety or effectiveness of any of the individual active ingredients; and when the combination, when used under adequate directions for use and warnings against unsafe use, provides rational concurrent therapy for a significant proportion of the target population.
 
 
 31
 21 C.F.R. Sec. 330.10(a)(4)(iv). The government argues that Block has failed to show by substantial evidence 1) that potassium nitrate makes a contribution to the claimed effect of the combination, and 2) that the combination is effective in preventing cavities.B. Contribution of Potassium Nitrate
 
 1. The Government's Position
 
 32
 The government argues that Block has not presented "substantial evidence" upon which a finding of "general recognition" of safety and effectiveness must be based. The government argues that the only clinical study of the combination, the Silverman study, failed to test the combination against a sodium MFP-only toothpaste and is therefore deficient because sodium MFP may be responsible for the desensitizing effect of the combination. If so, the potassium nitrate would not make the contribution to the claimed effect required by section 330.10(a)(4)(iv).
 
 2. Block's Position
 
 33
 Block raises a number of challenges to the government's position. First, relying upon United States v. An Article of Drug ... Entrol-C Medicated, 513 F.2d 1127, 1129 (9th Cir.1975), and United States v. An Article of Drug ... Mykocert, 345 F.Supp. 571, 576 (N.D.Ill.1972), Block argues that Promise is not a new drug because the combination is no "greater or newer than its component parts," each of which is generally recognized as safe and effective. Appellants' Br. at 13. In making this argument, Block stresses that there is no theoretical or actual concern about the ingredients interacting.
 
 
 34
 Next, Block argues that there was no need to test the combination against a sodium MFP-only toothpaste. Block's experts note that approximately 80% of the Silverman study's participants previously had used fluoride toothpastes and continued to suffer from dentin hypersensitivity. This factor, they argue, serves as a sufficient historical control, see 21 C.F.R. Sec. 314.126(b)(2)(v), and thus obviates the need to test the combination against a sodium MFP-only toothpaste. The district court improperly imposed, Block argues, a requirement that the combination's effectiveness could be shown only by testing the combination against each of its active ingredients. Finally, Block argues that the FDA has allowed other combination drugs to be marketed OTC based upon data regarding only the individual ingredients of the combination. Thus, it argues that its drug is being treated differently from similarly situated drugs.
 
 3. Discussion
 
 35
 Block's argument cannot be squared with the requirements of section 330.10(a)(4)(iv). The regulation requires that each active ingredient make a contribution to the claimed effect of the combination. This contribution must be shown by "substantial evidence." 21 U.S.C. Sec. 355(d)(5); see 21 C.F.R. Sec. 330.10(a)(4)(ii). However, the only study actually conducted with the combination, the Silverman study, made no attempt to test the combination against a sodium MFP-only toothpaste.[8] Thus, Block has failed to show by "substantial evidence" that potassium nitrate makes a contribution to the claimed effect of treating dentin hypersensitivity. See 21 C.F.R. Sec. 330.10(a)(4)(iv); see also United States v. An Article of Drug Consisting of 4,680 Pails, etc., 725 F.2d 976, 984-87 (5th Cir.1984); Masti-Kure Prod. Co. v. Califano, 587 F.2d 1099, 1105 (D.C.Cir.1978).
 
 
 36
 Block's argument that the previous regular use of a fluoride toothpaste by approximately 80% of the participants in the Silverman study served as an adequate historical control, 21 C.F.R. Sec. 314.126(b)(2)(v), is unpersuasive. While the results of the Silverman study may suggest that potassium nitrate is responsible for the desensitizing effect of the combination, the regulations provide that a more specific showing be made. The regulation states:The results of treatment with the test drug are compared with experience historically derived from the adequately documented natural history of the disease or condition, or from the results of active treatment, in comparable patients or populations. Because historical control populations usually cannot be as well assessed with respect to pertinent variables as can concurrent control populations, historical control designs are usually reserved for special circumstances. Examples include studies of diseases with high and predictable mortality (for example, certain malignancies) and studies in which the effect of the drug is self-evident (general anesthetics, drug metabolism).
 
 
 37
 21 C.F.R. Sec. 314.126(b)(2)(v). A review of the materials presented to the district court reveals that the Silverman study was not designed to use the subjects' prior use of a fluoride toothpaste as a historical control. Participants were simply asked what brand of toothpaste they used and how many times a day they brushed their teeth. It does not appear that the test was designed to use a given percentage of regular fluoride toothpaste users. Moreover, it does not appear that the test was altered after this high percentage of fluoride toothpaste users was discovered. As the government indicates, even if the prior fluoride toothpaste users could be considered a control group, "there is no way to assess the 'comparability of the test and control groups with respect to pertinent variables.' See 21 C.F.R. Sec. 314.126(b)(7)." Appellee's Br. at 17. The fact that approximately 80% of the participants previously used fluoride toothpastes may be merely a coincidence. The study in no way seeks to compare the results with respect to these individuals to the results with respect to other participants. Thus, Block has not shown by "substantial evidence" that potassium nitrate contributes to the effects claimed on the label of Promise.[9]
 
 C. Anticaries Effect of Promise
 1. The Government's Position
 
 38
 The government also argues that Block has failed to show the anticaries effectiveness of Promise because the Silverman study made no attempt to test the anticaries effect of the combination. In 1980, an FDA panel published a list of anticaries drug products, the safety and effectiveness of which could be shown through laboratory testing profiles, because a sufficient amount of clinical testing had already been performed.[10] The advisory panel limited its approval of OTC anticaries products to those containing "single active ingredients." 45 Fed.Reg. 20,673-74. The government argues that the district court was correct when it held that, because this monograph limited its discussion to anticaries drug products containing single active ingredients, Block was not entitled to rely on laboratory testing profiles, but instead was required to show the safety and effectiveness of the combination through clinical studies "testing the product itself." Promise Toothpaste, 624 F.Supp. at 785. The government further points out that, in any event, no sodium MFP/potassium nitrate combination was included on the list of approved anticaries products. See 45 Fed.Reg. 20,673-74, 20,690-91.
 
 2. Block's Position
 
 39
 Block argues that it was entitled to rely upon laboratory testing profiles to establish the anticaries effect of the combination because sodium MFP is generally recognized as safe and effective and because Block presented expert testimony that the potassium nitrate would not affect the effectiveness of the sodium MFP as an anticaries agent. Block argues that the regulations allow alternate methods to establish substantial evidence of efficacy, see 21 C.F.R. Secs. 330.10(a)(2), 314.126(c), and that it should have been allowed to use an alternate method. Block also argues that a majority of the panel members have indicated to Block that the monograph's use of the term "single active ingredient" was meant to refer to a single anticaries active ingredient and did not preclude combinations that also served purposes other than anticaries functions.
 
 3. Discussion
 
 40
 We agree with the district court that Block was not entitled to rely solely upon laboratory testing profiles to establish Promise's effectiveness in preventing cavities. The advisory panel limited its approval of OTC anticaries products to those containing "single active ingredients." 45 Fed.Reg. 20,67 3-74. Block argues that the proposed monograph's reference to "single active ingredients" refers to products with a single active anticaries ingredient--even if that product contains other active ingredients designed to achieve other purposes. However, even if Block is correct, its argument still fails. The combination of a single anticaries agent and another active ingredient is still a "new drug" subject to the requirements of 21 U.S.C. Sec. 355(a) (requiring an approved NDA to be on file before a "new drug" is marketed). The proposed monograph simply does not purport to grant approval to such a product.[11] Block's experts submit that the data from sodium MFP alone is sufficient to demonstrate the combination's effectiveness because there is no reason to believe that the addition of potassium nitrate will reduce the effectiveness of the sodium MFP. However, the regulations require more than the opinions of experts. See 4,680 Pails, 725 F.2d at 987 ("Substantial evidence does not consist of the expressed opinions of experts hired to testify on behalf of one party or the other. Instead, it consists of adequate and well-controlled studies that must be generally available to the scientific community."). It is true that a waiver of such a requirement may be obtained. See 21 C.F.R. Secs. 330.10(a)(2), 314.126(c). However, Block never sought such a waiver. It took the risk of marketing its drug without approval. Now it must accept the consequences. As a result, we believe that Block is required to prove the anticaries effectiveness of Promise through clinical testing of the combination itself.
 
 Conclusion
 
 41
 Block has raised no genuine issue of material fact as to whether Promise meets the regulatory requirements for being "generally recognized as safe and effective." Therefore, the toothpastes are "new drugs" under 21 U.S.C. Sec. 321(p). Finally, because no approval of an NDA "is effective with respect to such drug[s]," they have been introduced into interstate commerce in violation of 21 U.S.C. Sec. 355(a), and are subject to the forfeiture provisions of 21 U.S.C. Sec. 334. Accordingly, the order of the district court granting summary judgment in favor of the government is affirmed.
 
 AFFIRMED
 
 
 [1]
 21 U.S.C. Sec. 334(a) provides, in pertinent part:
 Any article of food, drug, or cosmetic ... which may not, under the provisions of section 344 or 355 of this title, be introduced into interstate commerce, shall be liable to be proceeded against while in interstate commerce, or at any time thereafter, on libel of information and condemned in any district court ... within the jurisdiction of which the article is found.
 
 
 [2]
 Under 21 U.S.C. Sec. 321(p)(2), a "new drug" is also defined as:
 Any drug (except a new animal drug or an animal feed bearing or containing a new animal drug) the composition of which is such that such drug, as a result of investigations to determine its safety and effectiveness for use under such conditions, has become so recognized, but which has not, otherwise than in such investigations, been used to a material extent or for a material time under such conditions.
 This appeal, however, only involves issues regarding whether Promise has met the requirements of subsection (1) of section 321(p).
 
 
 [3]
 See 21 U.S.C. Sec. 352. Because our disposition of this appeal is based on the "new drug" provisions, the specific requirements of the misbranding provisions need not be discussed
 
 
 [4]
 The government argues that this reference to "single active ingredients" limits the panel's recommendation to toothpastes containing only one active ingredient, which ingredient is an anticaries agent. Appellee's Br. at 22-23. Block argues that the panel intended to limit its recommendation only to exclude combinations of anticaries agents, and that a combination such as Promise, being composed of an anticaries agent and a desensitizing agent, would have been acceptable to the panel. Appellants' Br. at 19-22
 
 
 [5]
 Although it is not entirely clear that potassium nitrate itself is generally recognized as effective for treating dentin hypersensitivity, the district court assumed that it was for purposes of the motion for summary judgment. United States v. Articles of Drug ... Promise Toothpaste, 624 F.Supp. 776, 780 (N.D.Ill.1985)
 
 
 [6]
 The district court later noted that the Silverman study was published in February 1985, "approximately 1 1/2 years after the case was filed." Promise Toothpaste, 624 F.Supp. at 786 n. 1
 
 
 [7]
 The district court limited each party to three experts. R. 64
 
 
 [8]
 All of Block's experts relied in part on the Silverman study. One of its experts specifically stated that the Silverman study was necessary to his conclusion that Promise was generally recognized as safe and effective. Ciancio Dep. at 21; Appellee's App. at 158. Block's other two experts apparently were unwilling to say that the Silverman study was unnecessary to their conclusions. Mandel Dep. at 18-19; Appellee's App. at 113-14; Featherstone Dep. at 8; Appellee's App. at 172. This reliance on the Silverman study by all of Block's experts also negates Block's contention that the combination drug is not a new drug because it is "no greater or newer than its parts."
 
 
 [9]
 We also reject Block's arguments that 1) the district court improperly required Block to show effectiveness through only one method, 2) the district court required Block to show that Promise was more effective than a potassium nitrate-only toothpaste; and 3) the FDA's treatment of Promise has been different from its treatment of other combination drugs
 First, the district court did not require Block to use a particular method, it simply required Block to show that each active ingredient made a contribution to the claimed effect. Moreover, while the regulations allow alternative forms of proof other than those specifically set forth in the regulations, the FDA must approve alternative methods of proof by waiving the usual regulation requirements. See 21 C.F.R. Secs. 330.10(a)(4)(ii), 314.126(c). Here, obviously, Block neither sought nor obtained a waiver from the FDA. Block could have sought such a waiver prior to marketing Promise; however, it chose not to do so.
 Second, the district court did not require Block to show that Promise was more effective than a potassium nitrate-only toothpaste. Again, it required Block to show that each active ingredient made a contribution to the claimed effect.
 Finally, the examples cited by Block to show a difference in treatment of Promise as compared to other combination drugs are unpersuasive. As the government indicates in its brief, in this case, the problem is that the two components of the combination could possibly have the same effect because they are from the same pharmacological group. In two of the examples cited by Block, the FDA approved combinations of drugs from different pharmacological groups. See 49 Fed.Reg. 11,888 (1984); 41 Fed.Reg. 38,323 (1976). Moreover, to the extent there may be an inconsistency presented by the third example, the government emphasizes that these monographs are proposed rules that are prepared independently of the FDA and that do not necessarily represent the position of the FDA. In any event, a single deviation from the statutory and regulatory norm to which the agency has otherwise adhered hardly establishes an administrative policy or regulatory interpretation upon which appellants can rely.
 
 
 [10]
 The panel stated:
 The Panel concludes that all of the fluoride compounds placed in Category I [generally recognized as safe and effective] as active ingredients have been shown through numerous clinical trials to be safe and effective for OTC use. However, because the abrasive in dentrifice formulations may alter the availability of the fluoride to the teeth, the Panel concludes that certain stability and bioequivalency data on the final formulation are necessary before that formulation is marketed.
 In the opinion of the Panel, the extensive amount of testing, which has included laboratory, animal, and clinical tests, allows prediction as to which dentifrice formulations will be effective. The Panel concludes that, if certain analytic and biologic tests are conducted and acceptable test values are achieved, clinical testing is not required. The acceptable test values are those obtained from dentifrice formulations that have already been proven to be effective through clinical testing.
 
 
 [45]
 Fed.Reg. 20,677 (1980)
 
 
 [11]
 Moreover, in a Tentative Final Monograph, the FDA has listed active ingredients it considers generally recognized as safe and effective for anticaries use. 50 Fed.Reg. 39,854 (1985). This list includes no combination products. Id. at 39,871-73. Indeed, this Tentative Final Monograph also does not include the laboratory testing profiles suggested in the proposed monograph